ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Hane L. Kim
Kevin P. McGrath
Austin Thompson
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0533 (McGrath)
mcgrathk@sec.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | <u>COMPLAINT</u> |
| Plaintiff, | 23 Civ. 2316 (     ) |
| -against- | |
| SURAGE KAMAL ROSHAN PERERA and JANUES CAPITAL INCORPORATED, | JURY TRIAL DEMANDED |
| Defendants, | |
| -and- | |
| NISHANI ALAHAKOON, | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Surage Kamal Roshan Perera ("Perera") and Janues Capital Incorporated ("Janues") (collectively, "Defendants"), and Relief Defendant Nishani Alahakoon ("Alahakoon"), alleges as follows:

**SUMMARY**

1.      The Commission brings this action to halt Defendants' ongoing violations of the federal securities laws.

2.      Since at least February 2022 and continuing to March 2023 ('the relevant period"), Perera, a former broker, through his firm Janues, defrauded at least one investor out of millions of dollars by lying about investment opportunities and strategies; misappropriating the investor's money by, in part, not purchasing the securities she subscribed to through Janues and using a substantial portion of her money to engage in high volume, highly leveraged trading in other securities; lying to her about non-existent investment profits; and concealing large trading losses.

3.      During the relevant period, Perera falsely told the investor that Janues had access to specific restricted securities at discounted prices though connections with large institutions.  He also claimed to exercise a trading strategy—which he called "options straddles"—that would not only prevent any trading losses but also, for some of the supposed investments, guarantee returns on the investment of at least 9% and up to as much as 50%.

4.      Perera's false promises convinced the investor to give him approximately $4.3 million.

5.      Perera did not use the investor's funds to purchase the securities she had subscribed to, and did not engage in the promised "options straddles" to prevent trading losses and generate the profits he had guaranteed.  Instead, he transferred at least $3.5 million of the investor's funds to a brokerage account in the name of his wife, Alahakoon, and used those funds to engage in highly speculative, leveraged trading.

6.      In total, between March 1, 2022 and February 28, 2023, Perera's trading in securities transactions in his wife's brokerage account resulted in over $3 million in trading losses.

7.      Perera concealed his misappropriation of the investor's funds and his trading losses by providing the investor with phony trade confirmations and account statements that falsely showed the expected returns, and by using funds received from other sources to partially repay the investor victim.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Perera and Janues have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and Perera aided and abetted Janues' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

11.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated and barring them from soliciting new clients and soliciting funds from existing clients; (b) ordering Defendants

to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)] (d) permanently prohibiting Perera from serving as an officer or director of any issuer that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) ordering Relief Defendant Alahakoon to pay, jointly and severally with Defendants, all ill-gotten gains by which she was unjustly enriched, with prejudgment interest, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and (f) ordering any other and further relief the Court may deem just and proper.

12.    To maintain the *status quo* and preserve assets sufficient for Defendants to pay disgorgement, prejudgment interest, and civil penalties and for the Relief Defendant to pay disgorgement and prejudgment interest in accordance with any final judgment of this Court, the Commission further seeks emergency relief during the pendency of this action including: a temporary restraining order and preliminary injunction enjoining Defendants from ongoing and future violations of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 thereunder, and Advisers Act Sections 206(1) and 206(2), and enjoining Defendants from soliciting new clients and soliciting additional funds from existing clients; and an order (a) freezing Defendants' and Relief Defendant's assets; (b) permitting expedited discovery; (c) requiring Defendants and the Relief Defendant to provide the Commission with sworn accountings; and (e)

prohibiting Defendants and the Relief Defendant from destroying, altering, or concealing documents.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

14.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Defendants may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that Perera and Alahakoon reside in this District; Perera met with, and engaged in discussions and communications with, the investor victim in furtherance of Defendants' fraudulent scheme in this District, and the brokerage account used in furtherance of Defendants' fraud was listed to Perera's home address in this District.

## DEFENDANTS

16.     **Perera,** age 50, resides in Bellerose, New York.  Perera has identified himself variously as the President, Managing Director, and Executive Director of Janues.  He is the only authorized signatory listed on Janues's bank account (the "Janues Bank Account").  Perera is not currently associated with any entity registered with the Commission.  However, he was employed in the securities industry from 2004 to September 2022, and holds Series 7, 24, and 63 licenses.  Perera was associated with a dually-registered broker-dealer and investment adviser ("Company A") from

April 2018 to September 2022.  Before that, he was associated with 10 other broker-dealers and/or

investment advisers or dually-registered firms.

17.    **Janues**, incorporated by Perera in 2014 in New York, has a listed address of 40 Wall

Street, 28th Fl., New York, N.Y.  Janues purports to be a "capital market advisory firm for mid-sized

corporations." Janues has never been registered with the Commission.

**RELIEF DEFENDANT**

18.    **Alahakoon,** age 46, resides in Bellerose, N.Y.  She is Perera's wife.  Her occupation

is described as "homemaker" on her account opening application for the brokerage account that

Defendants used in connection with their scheme.  She is also a licensed real-estate salesperson.

**FACTS**

I.    **DEFENDANTS ADVISE INVESTOR A TO MAKE INVESTMENTS THROUGH JANUES IN VARIOUS SECURITES BASED ON FRAUDULENT REPRESENTATIONS AND THEN MISAPPROPRIATE HER FUNDS**

A.    **Defendants Advise Investor A on Eight Investments Relating to Four Issuers**

19.    Investor A first met Perera through a mutual friend when Perera was a registered

representative of Company A.

20.    From February 2022 to August 2022, Perera convinced Investor A to subscribe to

eight investments for four different issuers (the "Issuers") that he claimed he could offer her

through Janues, which he described as "a cross-border capital market advisory firm for mid-sized

corporations globally."

21.    Perera claimed to have relationships with certain large institutions that would allow

him to purchase, through Janues, large allotments of restricted stock in the Issuers at a discount

from the market price.  He offered to have Janues allocate a portion of those restricted shares to her

and advised her to make these investments.

22.    Perera told Investor A that, while the price of the securities could change during the

restricted period (when the stocks could not be sold), Perera would use an "options straddle" strategy—purchasing put options while selling call options—to prevent losses during the restricted period and, for some investments, guarantee gains.

23.     Perera provided Investor A with subscription agreements between Janues and Investor A pursuant to which the Defendants offered the opportunity to subscribe to a set number of restricted shares of a certain Issuer at a specific price, which Investor A would be able to re-sell after a set period of time.  Certain of these agreements specified a fee which Janues would be paid.

24.     For example, Perera advised Investor A to invest in Issuer H through Janues, which she did on February 28, 2022.

25.     On or about February 25, 2022, Perera provided Investor A a proposed subscription agreement pursuant to which the Defendants offered Investor A the opportunity to "subscribe[] for **10,000 restricted** shares of **[Issuer H]** at a price of **USD 15.00** in the membership interest . . . ." (emphasis in original).  Investor A ultimately agreed to subscribe for 18,000 shares at this price.

26.     In exchanges over WhatsApp, a messaging service, from February 25 to February 28, 2022, Perera guaranteed profits on the investment.  He explained that Janues would purchase Issuer H put options at $16.30 per share and sell call options at $22.50 per share.  He informed Investor A that, pursuant to this option straddle strategy, she could "get $1.30 i.e (8.66% minimum) and maximum 50% upside," referring to a minimum profit of 8.66% if the stock dropped below $15 and a maximum profit of 50% return per share if the stock rose above $22.50.

27.     Through August 2022, Perera provided Investor A similar advice for seven additional investments to which she subscribed.  The eight investments are reflected in Table 1 below:

**Table 1**

| Purchase Date | Issuer | Units | Price | Fee | Amount Paid to Janues |
|---|---|---|---|---|---|
| 2/28/22 | Issuer H - Shares | 18,000 | $15.00 | 15% of certain profits | $270,000 (wire) |
| 3/16/22 | Issuer P - Warrants | 50,000 | $7.00 | Unknown | $350,000 (wire) |
| 4/5/22 | Issuer P - unknown type | 100,000 | $7.00 | Unknown | $700,000 (wire) |
| 6/1/22 | Issuer P - unknown type | 80,000 | $6.50 | Unknown | $520,000 (wire) |
| 6/21/22 | Issuer G - Units | 19,335 | $15.00 | 2% of purchase price + 12% of capital gains | $295,825 (includes 2% fee; paid for with rolled-over "proceeds") |
| 6/23/22 | Issuer G - Units | 85,000 | $15.00 | 1% of purchase price + 12% of capital gains | $1,287,750 (includes 1% fee; wire) |
| 8/17/22 | Issuer A - Units | 13,000 | $39.00 | 1.5% of purchase price + 12% of capital gains | $507,000 (wire) |
| 8/22/22 | Issuer A - Units | 17,000 | $39.00 | 1.5% of purchase price + 12% of capital gains | $663,000 (wire) |
| **Total Wired (excluding 6/21/22 "rollover")** | | | | | **$4,297,750.00** |

28.    Various of the subscription agreements expressly set forth the "options straddle" strategy that Perera promised to employ and expressly guaranteed a minimum profit.

29.    For example, Addendum A to both Issuer G subscription agreements represented:

The company will acquire unites [*sic*] of [Issuer G] fund at a price discounted cost of of [*sic*] $15.00 per share and deploy Options Straddles to achieve return illustrated below LESS any FEES):

| Fund Price ($) | Return |
|---|---|
| [Issuer G] ‹ 15 | 25.66% |
| [Issuer G]=15 | 25.66% |
| 15 ‹ [Issuer G] › 17.50 | 25.66% |
| [Issuer G] › 17.50 | 25.66% |

(*emphasis in original*).

30.    In addition to expressly guaranteeing returns in subscription agreements, Perera used a variety of tactics to reassure Investor A about the safety of the investments.

31.    For example, when Investor A expressed concerns in connection with the proposed investment in Issuer G, on June 20, 2022, Perera claimed the investments were protected by federal agencies, emailing her that the "OCC which is overseen by US Securities ExchangeCommission [*sic*] and the Commodity Futures Trading Commission" would "guarantee future payment" on the investment strategy.  Perera's reference to "OCC" appears to be a reference to the Options Clearing Corporation.

32.    This representation was false and misleading as Defendants knew or recklessly disregarded, given that, as a licensed securities professional, Perera knew or should have known that the OCC is not a counter-party to such transactions and that neither the OCC, the SEC, nor the Commodity Futures Trading Commission "guarantees the future payment on the agreed terms" of any such transactions.

### B.    Defendants Fraudulently Misappropriate Investor A's Investment Funds Primarily for High Volume Speculative Trading

33.    For each of Investor A's investments, except for one Issuer G investment which was a "rollover" of supposed proceeds, Investor A wired the investment amount to the Janues Bank Account.  Each time, Perera withdrew most of her investment, including through direct transfers to his personal bank account (the "Perera Bank Account").  And each time, Perera then transferred a majority of the funds from the Perera Bank Account to a brokerage account in his wife's name (the "Alahakoon Brokerage Account"), where he then engaged in highly speculative trading, entirely unconnected to the promised investments and "options straddles" strategy.

34.    Perera appears to have had access and/or control of the Alahakoon Brokerage Account.  The only email address for the account appears to be an email for Perera: a Hotmail.com account listing his first and middle initials and his last name.  Perera also provided Investor A falsified Alahakoon Brokerage Account statements.  And when the brokerage firm called the account holder to discuss manipulative trading activity in the Alahakoon Brokerage Account during

this time period, records reflect that the representative spoke with a male and noted that "He agrees to modify his behavior."

35.     One illustrative example of how Perera moved Investor A's funds began on February 28, 2022, when Investor A wired $270,000 to the Janues Bank Account for the Issuer H investment.  On February 27, 2022, the Janues Bank Account held $201.20.  After Investor A's $270,000 wire to the Janues Bank Account cleared on February 28, 2022, Perera withdrew $120,000 and separately transferred $100,000 to the Perera Bank Account.

36.      On February 28, 2022, the Alahakoon Brokerage Account opened with a balance of only $115.70.  By the following day, March 1, 2022, Perera transferred $200,000 from the Perera Bank Account to the Alahakoon Brokerage Account.

37.     Between March 1 and March 14, 2022, Perera transferred an additional $35,000 from the Janues Bank Account to the Perera Bank Account and transferred an additional $40,000 from the Perera Bank Account to the Alahakoon Brokerage Account.  Thus, by March 14, 2022, Perera had withdrawn $255,000 total from the Janues Bank Account to the Perera Bank Account and transferred $240,000 total from the Perera Bank Account to the Alahakoon Brokerage Account.

38.     Perera moved Investor A's funds in a similar matter for the other seven investments, ultimately transferring from February to August 2022 at least $3.5 million of the nearly $4.3 million Investor A had invested to the Alahakoon Brokerage Account.

39.     Perera also misappropriated some of Investor A's funds to pay other potential investors and/or for other unauthorized uses.

40.     While Defendants purchased a limited number of shares in securities of two Issuers discussed with Investor A, Defendants did not use Investor A's funds to purchase the specific securities she subscribed to in connection with her eight investments, as Investor A had been promised and as reflected in Table 1.

41.     The Alahakoon Brokerage Account records also reflect no transactions in options of the Issuers to protect against losses and guarantee profits with respect to her subscribed investments, as Investor A had been promised.

42.     Instead, Perera appears to have lost the bulk of Investor A's funds in high volume, highly leveraged trading in securities other than the ones he advised Investor A to subscribe to. From March 2022 through February 2023, the account traded in more than 100 different securities, and to make more substantial trades, the Alahakoon Brokerage Account obtained significant margin loans from the broker-dealer, secured by the assets in the Alahakoon Brokerage Account.  During this period, $1,442,685,444.30 in securities were purchased and $1,439,571,821.73 in securities were sold in the Alahakoon Brokerage Account—resulting in losses of over $3 million.

43.     The remaining holdings in the Alahakoon Brokerage Account on February 28, 2023 were valued at only $59,712.59.

44.     Defendants' representations to Investor A that they would purchase, or already owned and would allocate to her, securities for the Issuers, and would purchase put options and sell call options in the Issuers to prevent losses and guarantee gains on her eight investments, were false and misleading, as Defendants knew or recklessly disregarded.

45.     Defendants knew or recklessly disregarded that they did not own and did not have the ability or intention to purchase the subscribed-to securities of the Issuers, or the intention to buy or sell options in connection with Investor A's subscription.

**C.     Defendants Repeatedly Mislead Investor A on the Status of Her Investments**

46.     Investor A asked Perera for proof of trading and the holdings of her investments, and Perera repeatedly provided fraudulent information to lull her into believing Defendants had used her funds as promised.

47.     Following investments for Issuer P, Issuer G and Issuer A, Perera emailed Investor

A at least ten fraudulent confirmations of transactions for the investment strategies, each of which listed the Alahakoon Brokerage Account number (with hyphens moved to different places) and were purportedly from the broker-dealer of the Alahakoon Brokerage Account.  Each fraudulent confirmation falsely listed the account holder as Janues Capital, Inc. III, with a 40 Wall Street, 28th Floor address, and reflected transactions that had never occurred in the Alahakoon Brokerage Account.

48.     Before Investor A was willing to invest in Issuer A, she asked for an account statement to verify her previous "total investment in your company."  On August 16, 2022, Perera sent Investor A a fabricated account statement dated August 15, 2022 on Janues letterhead, falsely reflecting 230,000 shares of Issuer P and 104,335 shares of Issuer G.

49.     Following completion of her investments, Perera continued to deceive Investor A into believing her investments were safe, secure, and profitable, to induce Investor A to stay in the fraudulent transactions longer.

50.     For example, on October 4, 2022, in response to Investor A's request for account statements, Perera fabricated account statements dated September 15, 2022 on Janues letterhead, falsely reflecting that Investor A held 230,000 shares of Issuer P; 104,335 shares of Issuer G; and 30,000 shares of Issuer A.

51.     Defendants' representations to Investor A that they had used her investments as promised, including the fraudulent account statements and confirmations, were false and misleading, as Defendants knew or recklessly disregarded.

## II.     DEFENDANTS FAIL TO RETURN INVESTOR A'S PRINCIPAL AND PURPORTED PROFITS AND CONTINUE TO DECEIVE HER AS THEIR SCHEME FALLS APART

### A.     Investor A's Profits Come Due

52.     Beginning in September 2022, the putative lock-up periods pertaining to Investor A's

initial investments began to end.  Table 2 sets forth the end of the putative lock-up period and the

principal amounts due:

**Table 2**

| Purchase Date | Issuer | Units / Price | Principal | End of Lockup |
|---|---|---|---|---|
| 2/28/22 | Issuer H - Shares | 18,000 / $15.00 | $270,000 | 8/28/2022 (rolled) |
| 3/16/22 | Issuer P - Warrants | 50,000 / $7.00 | $350,000 | 9/16/2022 |
| 4/5/22 | Issuer P - unknown type | 100,000/ $7.00 | $700,000 | 10/5/2022 |
| 6/1/22 | Issuer P - unknown type | 80,000 /$6.50 | $520,000 | 12/1/2022 |
| 6/21/22 | Issuer G - Units | 19,335 / $15.00 | $290,025 | 12/21/2022 |
| 6/23/22 | Issuer G - Units | 85,000 / $15.00 | $1,275,000 | 12/23/2022 |
| 8/17/22 | Issuer A - Units | 13,000 / $39.00 | $507,000 | 2/17/2023 |
| 8/22/22 | Issuer A - Units | 17,000 / $39.00 | $663,000 | 2/22/23 |

53.    Defendants led Investor A to believe she was entitled to much more than the

principal above, based on certain minimum profits they "guaranteed," as well as the fraudulent

account statements and other deceptive statements Perera had made.

54.    Defendants began partially paying Investor A her expected returns in July 2022,

wiring her $38,250 on that date, and then, through December 2022, an additional $450,000 over four

payments.

55.    However, Investor A was owed much more, and Perera manufactured reasons why

he could not pay her promptly.

56.    For instance, on December 19, 2022, Perera described in an email a detailed process

for why Issuer G units could not yet be sold:

> [Issuer G], was issued to us at discount to the market and was a restricted stock.  The
> first part of removing restrictions is to hold 180-days from purchase which we will
> complete on Dec-22nd and will submit all [Issuer G] for removal of "restrictions" or
> the "legend" on all stocks.  This means the stock will be sent to a transfer agent and
> will ultimately be signed off by [Issuer G] itself as "Free and Clear".  Once these
> steps are completed, we will be able to liquidate, cash-out and wire the funds back.

57.    Then on January 21, 2023, Perera claimed to have submitted the request on

December 22, 2022, but the holidays had delayed the process:

As per the transfer agent's communique, it will take 6-8 weeks and will then would go to [Issuer G] legal counsel for the opinion letter and it's a long process.  These are large corporations and we are dealing with being compliant with an SEC rule.  The deals we did were lucrative, however they come with the restrictions that are beyond our control.  I could not estimate the time.

58.     These statements were false and misleading, as Defendants knew or recklessly disregarded, given that they had not purchased any Issuer G units.

59.     By January 2023, Investor A was entitled to expect the return of her $1,565,025 in principal from the Issuer G transactions plus substantial promised returns on these subscriptions.

60.     On January 23, 2023, the Janues Bank Account balance opened with approximately $9,930.  That day, a third party wired $300,000 into that account, and two days later Perera wired $171,000 to Investor A, falsely claiming the payment reflected returns for her Issuer G investment.

61.     On February 3, 2023, Perera paid Investor A an additional $38,250 in connection with her Issuer G investment.

62.     Perera provided Investor A, on February 9, 2023, with a fraudulent brokerage statement.  The statement falsely reflected an over 100% "unrealized gain" of $2,992,000.00 in the Issuer P warrants that Janues was purporting to hold for Investor A.  This statement also falsely reflected transfers of 120,000 Issuer G and 50,000 Issuer A "restricted stocks" for "legend removal"—the deceptive process that Perera was then claiming prevented him from delivering profits to Investor A.

**B.     Investor A Uncovers Defendants' Scheme**

63.     In February 2023, Investor A spoke with two individuals, including one of Perera's former Company A colleagues, who both told her that the Defendants could not have obtained securities in the relevant companies at the claimed discount.  This led her to become suspicious of Perera.

64.     In their subsequent discussions, Perera refused to admit any wrongdoing, but

provided Investor A with several proposed repayment schedules, while evading questions on the source of the repayment funds.

65.     For example, on February 16, 2023, Perera emailed Investor A, stating in part:

Following are the repayment plans that I am confidant of settling your initial Capital introduced.

1,682,750 – Will be settled on or before March 15th 2023

1,170,000 – Will be settled on or before April 15th 2023

In the meantime, the other capital investments will be settled on an ongoing basis as we discussed.  You and I can arrange the dates for those fund transfers.

I hope that we can work this out amicably and resolve these outstanding issues so that we continue our relationship for the future.

66.     On February 24, 2023, Perera made statements to Investor A indicating that he was obtaining money from other people to repay Investor A; he said had "mixed together" funds and would "have to reach for loans from other people because certain transactions have lost money." His statements indicate there may be other victims, admitting: "I want to settle a few people, you're number one."

67.     On or about February 28, 2023, Perera provided Investor A a proposed "Buyback and Settlement Agreement" between Janues and Perera on the one hand and Investor A on the other hand.  Defendants admitted in the Buyback and Settlement Agreement that they had entered into Subscription Agreements for each of the Table 1 investments.  The Agreement further stated that Defendants owed Investor A a total of $5.72 million, and had paid $920,000 to date. Defendants promised to pay Investor A the remainder in four installments: $1.7 million on March 15; $1.2 million on April 15, 2023; $1 million on May 15, 2023; and $900,000 on June 15, 2023.

68.     On March 15, 2023, Perera paid Investor A $75,000, not the $1,700,000.00 he promised he would pay on that date.

69.     Investor A asked for a wire of $700,000 by March 17; Perera responded: "this timing

is an issue with all the bank failures.  I will however confirm tonight.  I am working on your payments everyday [*sic*] with all I got."

70.    Then, on March 17, Perera messaged Investor A: "my loans funding delayed.  I will let you know the wire date.  My party banks with Signature NY and there's a profess [*sic*] to get the funds."

71.    Perera did not wire $700,000.00, or any amount, to Investor 1 on March 17, 2023.

72.    Table 3 below reflects payments Defendants made to Investor A from July 2022 through March 2023:

**Table 3**

| Paid Date | Purported Justification | Amount |
|-----------|------------------------|--------|
| 7/7/22 | Issuer G Dividend | $38,250.00 |
| 10/5/22 | Sale of Issuer P | $196,540.00 |
| 10/26/22 | Issuer G Dividend | $38,250.00 |
| 12/7/22 | Sale of Issuer P | $100,000.00 |
| 12/8/22 | Sale of Issuer P | $71,000.00 |
| 1/25/23 | Sale of Issuer P | $171,000.00 |
| 2/3/23 | Issuer G Dividend | $38,250.00 |
| 2/3/23 | Unknown | $26,102.25 |
| 2/13/23 | Sale of Issuer P | $228,000.00 |
| 2/14/23 | Sale of Issuer P | $11,000.00 |
| 3/15/23 | Paid per Buyback and Settlement Agreement | $75,000.00 |
| **Total Repaid** | | **$993,392.25** |

73.    Since February 2022, Investor A sent Perera $4,297,750; Perera has repaid Investor A a total of only $993,392.25 despite her repeated requests for the return of her entire investment. Thus, without considering the additional purported investment returns, Perera misappropriated a minimum $3,304,357.75 of Investor A's funds.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Both Defendants)

74.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

75.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

77.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

78.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

79.      By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Violations of Advisers Act Sections 206(1) and (2)**
**(Both Defendants)**

80.      The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

81.      At all relevant times, Perera and Janues were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

82.      Perera and Janues, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

83.      By reason of the foregoing, Perera and Janues, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Section 17(a)(2)**
**(Perera)**

84.      The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

85.     As alleged above, Janues violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

86.     Perera knowingly or recklessly provided substantial assistance to Janues with respect to its violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

87.     By reason of the foregoing, Perera is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Janues's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Perera will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Perera)

88.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

89.     As alleged above, Janues violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

90.     Perera knowingly or recklessly provided substantial assistance to Janues with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

91.     By reason of the foregoing, Perera is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Janues's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Perera will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Sections 206(1) and (2)
### (Perera)

92.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

93.     As alleged above, Janues violated Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

94.     Perera knowingly or recklessly provided substantial assistance to Janues with respect to its violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

95.     By reason of the foregoing, Perera is liable pursuant to Advisers Act Section 209(f) [15 U.S.C. § 80b-9(f)] for aiding and abetting Janues's violations of Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and, unless enjoined, Perera will again aid and abet these violations.

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendant Alahakoon)

96.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 73.

97.     Defendants transferred at least $3.5 million of monies they fraudulently obtained from Investor A, and possibly other victims, into Alahakoon's Brokerage Account.

98.     Alahakoon has no legitimate claim to these ill-gotten gains.

99.     Alahakoon obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds.

100.    Alahakoon has therefore been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Perera and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) [15 U.S.C. § 78j(b) and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Adviser Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## II.

Permanently enjoining Janues and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) [15 U.S.C. § 78j(b) and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Adviser Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

## V.

Permanently prohibiting Perera from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## VI.

Ordering Alahakoon to pay, with prejudgment interest, all ill-gotten gains by which she was unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## VII.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
        March 27, 2023

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Hane L. Kim
Kevin P. McGrath
Austin Thompson
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0533 (McGrath)
mcgrathk@sec.gov
